Corrections, Case No. 22-2399. How much time would you like to reserve for rebuttal? Three minutes please, Your Honor. Sure. Sounds good. Good afternoon, Your Honors, and may it please the Court. I'm Matthew Feldman from the Pennsylvania Institutional Law Project on behalf of the Plaintiff Appellant Roy Lee Williams. This Court should reverse the District Court on each of Mr. Williams' three claims because, first, the District Court acknowledged a genuine factual dispute as to the defendant's awareness of Mr. Williams' mental illness, but it omitted mental illness entirely from its Eighth Amendment analysis. And it did this despite an extensive body of case law holding solitary confinement of the mentally ill unconstitutional, including this Court's opinions in Polakovic and Clark. Second, in its ADA analysis, the District Court failed to take the factual dispute it acknowledged to its logical conclusion, namely that there was also necessarily a factual dispute as to the DOC's deliberate indifference. And third, in dismissing the due process claim at the screening stage, the District Court flouted this Court's repeated instructions to construe pro se pleadings liberally and to focus on the facts alleged in the pro se complaint, not the labels that pro se litigants put on their claims. I'd like to turn now to the Eighth Amendment claim in more detail. In relying exclusively on this Court's decision in Porter and ignoring the evidence of Mr. Williams' mental illness, the qualified immunity analysis offered by defendants and the District Court is wrong for three reasons. Let me ask, how do we get around the language in Porter that says cases that challenge conditions on death row are distinct from cases brought by inmates in general populations subject to solitary confinement? Well, I think the death sentence is not determinative of the outcome here, and that's for a few reasons. First, this case involves allegations of preexisting mental illness that made Mr. Williams more susceptible to the harms of solitary confinement. That brings this case into the land of Polakovic and Clark, and that factor was not present in Porter at all. There were no allegations of preexisting mental illness. Second, we have to look at the substantive Eighth Amendment doctrines here, which tell us that, you know, to prove an Eighth Amendment conditions of confinement claim, a plaintiff needs to establish that they were exposed to conditions that presented a substantial risk of serious harm. That's going to depend on characteristics of the plaintiff, like their preexisting mental illness, things like that. It does not depend on the reason they were subjected to those conditions, for example, a death sentence. You know, a death sentence, the presence or absence of a death sentence is not going to affect how much an individual is harmed by solitary confinement. So that, at one level, that's, I think what you've done is provide an explanation, but I also think that Judge Montgomery Reeves was getting at that there's still a pretty sharp divide, I think, in our case law of death sentence, treatment of death sentence eligible inmates and then general population inmates. And so when we want to talk about a clearly established prong, right, the explanation that you gave may work, right? It may actually begin to explain certain things. But in terms of how clearly established that is, when the case law follows a pretty sharp divide, I don't know that the explanation that you provided is currently extant in our case law. What do you say to that? Yeah, I understand the question, Your Honor. So a couple of responses to that. I think the way in which a death sentence or any reason why an individual is put in solitary confinement, the way in which that can come into the analysis is because this Court has said that penological justification can be considered. It is not an element of the claim, as this Court explained in Clark, but it can be considered. But here, unlike in Porter, there is nothing in the record that would explain how Mr. Williams' death sentence justified his placement in solitary confinement, either on an individualized level or even on a more broad level. There's nothing in this record here explaining why the DOC thought it necessary to put individuals generally in solitary confinement. And when that evidence was presented – But would it matter if the evidence was there, given 26 years of solitary confinement, would it matter the reason for putting him in there for 26 years? No, Your Honor. I actually don't think it would. I think 26 years in solitary confinement for an individual with preexisting mental illness, I don't think any justification would be sufficient there, especially when you compare this situation to Clark, which involved a term of about seven months in solitary confinement, and Polakovic, which involved multiple 30-day stints in solitary confinement. Here, we're talking about 26 years. And I think this Court has said that, you know, for some – sometimes there exist some conditions of confinement that violate the Eighth Amendment, irrespective of penological justification. And there exist other conditions that – where whether they violate the Eighth Amendment will depend on the penological justification. This Court laid that out very clearly in Thomas v. Tice, where they said – that was a case about dry cell confinement. But what the Court said there was that dry cell confinement violates the Eighth Amendment if either the conditions in the cell are foul or inhuman, or if the placement lacks penological justification. So what that makes clear is that, like I said a moment ago, there exist some conditions that are going to violate the Eighth Amendment, irrespective of penological justification. So going back to why, you know, the death sentence is not determinative here – and in fact, it shouldn't even be part of the way this Court frames the right for its qualified immunity analysis. In Clark, this Court said why a prisoner is placed in solitary confinement is not an element in challenging that condition. The Clark Court noted that in Polakovic, the reason the plaintiff there had been placed in solitary confinement was not discussed. And then in Clark itself, when this Court reframed the right at issue, it did not say anything at all about why Mr. Clark had been placed in solitary confinement. Well, so we agree with you about whether or not it is part of the analysis for the right. It is part of the analysis for qualified immunity, right? I don't think it is, Your Honor, because, again, you know, the qualified immunity analysis tells us to include, you know, the legally relevant details, not every single possible detail that exists. And particularly in cases – you know, yes, there has been guidance from the Supreme Court that says in certain types of cases, the right needs to be framed at a very granular level with, you know, with every plausible detail included. And that's especially true in, you know, cases involving sort of quick decisions, excessive force cases, Fourth Amendment cases. This is not that. And, again, you know, the death sentence doesn't have any legal relevance here, so why should it be included? The only way it could come in, the only way it could be relevant, as I said a moment ago, is to the extent it is as penological justification. But there's nothing in the record about that here. So to sort of start to speculate about why Mr. Williams was in solitary confinement or why the DOC thought the death sentence justified his placement in solitary confinement, that would be going outside the record. It would be, you know, drawing inferences for the other side, which is not appropriate at this stage. So maybe you see that when there's a policy in place, though, right, in terms of how a condition of confinement should be administered, in this case solitary confinement, and a warden is following that policy and the policy has never, ever, ever been declared kind of facially unconstitutional but has been picked off for certain of its applications along the way. And are we in a situation where someone else, another warden who follows that policy but doesn't fit squarely into one of those what I'm calling pick-off exceptions? It strikes me that if they're still following the policy and no one's stricken the policy constitutionally, it's very hard to say that it's clearly established that following that policy, even in another new area of exception, would be clearly established. I might have mischaracterized certain facts along the way here, so please, it's a bit of a hypo, but correct it and tailor it as needed. You can fight the hypo, so to say. But then I'd like to hear what your analysis is. Sure. So a few responses. First, you know, let's just keep in mind what the sort of qualified immunity analysis is. The question is, you know, did the official have fair notice that what they were doing violated the law? So the longstanding body of case law that I point to in the brief, you know, including Clark and Polakovic but all the other authorities that I cite in the brief, they would have given any prison official fair notice that keeping an individual with mental illness in solitary confinement for 26 years violated the Eighth Amendment irrespective of the reason they were prisoned. That doesn't really help you. You don't really need it. But Carter is after this. Clark? Clark, yes. Well, Your Honor, the Clark opinion is after this, but the Clark facts are 2016. So Clark says that as of 2016, it violated clear list application. But it said that after your client was released, wasn't he, from confinement? No. Mr. Williams' solitary confinement ended in 2019. Okay. But to get back to your question, Judge Phipps, about the policy. So first of all, here, it's very simple here because our defendant here is the policymaker. Okay? So the policy that kept death sentence prisoners in solitary confinement was a policy set by the DOC secretary, who is our defendant here, former Secretary Wetzel. So even in general, I don't think following state policy or state law is necessarily sufficient to entitle someone to qualified immunity. In the Williams case, the other Williams case, this court said state policy cannot, yes, state policy cannot undermine a constitutional interest. But also, it would be a particularly, you know, perverse result if we said that a policymaker was entitled to qualified immunity because they were entitled to a policy, because they were following a policy that they set. I mean, that would be, like I said in the brief, that would be essentially a form of absolute immunity for them to just codify their desired action into a policy and then say, well, I'm just following policy, qualified immunity. So I don't think that, I don't think the policy saves the day here. At least for policymakers. And that's the only issue here. Fair? Yeah, that's the only issue here. But I think the language that this court used in the prior Williams case, I think, would apply to, you know, that was not about policymakers per se. That was just saying that, you know, in general, state policy cannot undermine a constitutional interest. So I don't think the policy really, really helps them here. What about qualified immunity in the context of your 14th Amendment procedural due process claim? Sure. Well, so a few responses to that, Your Honor. First of all, qualified immunity was neither raised or briefed or passed on below on the 14th Amendment claim because it was dismissed at the screening stage. It never got to discovery. So it would be, you know, I don't, it would be very unusual for this court to reach the qualified immunity issue in the first instance at the pleading stage when it was not briefed or passed on below. But I'm also happy to address why I don't think the defendant would be entitled to qualified immunity on the 14th Amendment claim. Even forgetting qualified immunity, help me understand, since the conditions of confinement issue arises under the 8th Amendment, help me understand your claim for the 14th Amendment. So this is a procedural due process claim, so which requires a liberty interest and a lack of required procedural protections. That's the claim that a sort of liberal construal of Mr. Williams' pro se complaint, it becomes quite clear that that is the 14th Amendment claim he was putting forward, not a, you know, not a substantive due process claim, which is how the district court interpreted it. So what procedure, I know there's a revision and we talked about it in Williams, the other Williams, my Williams. There is a procedure for periodic review. Is that part of the claim as you understand it under the 14th Amendment here, for periodic review as someone placed in solitary confinement? I mean, I would remind the Court that we are at the, you know, for this claim we are at the pleading stage, so it's the allegations in Mr. Williams' verified complaint that, you know, is the set of facts we're dealing with. And his allegations were that there was no review. And I think everybody, I think the other side would even agree that there was no meaningful review of these individuals' placement in solitary confinement. There was no way that they could get out of solitary confinement, you know, through some review process. So I think the only, the disagreement between the parties on the due process claim is solely about the liberty interest problem, not about the procedural protections problem. So just to tease out this notion of liberal construction, right, I mean, it does require a bit of liberal construction because it just says, you know, due process without identifying kind of which prong of due process. But is it correct, and I don't want to claim to know all the ins and outs of prison litigation, but is it correct that they wouldn't have, that Mr. Williams would not have had a substantive due process claim because that would be kind of duplicative of the Eighth Amendment claim? And if so, doesn't, wouldn't that kind of make even the liberalness, the degree of liberalness that's needed to construe this as a procedural due process claim less? Is that right? I mean, if you sit there and say, hey, he said due process, of course he has no substantive due process claim. Substantive due process in this context is already swallowed by the Eighth Amendment. Therefore, the only reasonable reading is either he's bringing something completely frivolous that should be screened out or maybe he's bringing a procedural due process claim. But I guess I may, you know, for an institutional litigant, I may be asking you to concede or I don't know in the abstract that you don't have a substantive due process claim if there's an Eighth Amendment claim. No, I think that's exactly right, Your Honor. I think a claim brought under the due process clause that is solely just a challenge to the conditions of confinement is duplicative of the Eighth Amendment claim and is not viable under the more specific provision rule. So I think you're, if I'm understanding what you were saying, I think you're absolutely right, that what the judge did here, what the district court did here was say, this claim must be duplicative of the other claim, I'm going to dismiss it. Instead of looking at the factual allegations, which demonstrate that he's challenging the automatic placement, the lack of procedural protections, you know, and I can go through what those allegations are if Your Honors would like me to. It's in the brief. But he says, you know, subjecting a prisoner to solitary confinement without an administrative hearing. You know, that's procedural due process language. He says automatic placement in indefinite solitary confinement. That's procedural due process language. So can I tease out a little bit more about the procedural due process? What I understand is recovery under procedural due process is kind of strange, right? Because you wanted process, you didn't get it. You know, what do you do when you don't get process? And so one of the answers seems to be, well, we look to see compensatory damages, we look to out-of-pocket losses. In the abstract, you might be able to get mental and emotional damages too, but then we've got that provision of the PLRA that says you don't get mental or emotional damages whatsoever without them being tethered to physical or sexual injury, right? And so I guess I'm kind of curious in terms of is there anything to the procedural due process claim? Is it just a dead letter because there's no available recovery because I don't think there's a claim for compensatory loss that's not mental or emotional? What do you say? Well, a couple of responses to that. First, I think a close read of the record might reveal some physical harm to which the, you know, that would then open up the door to emotional harm damages because that's the physical injury provision. It's not no compensatory damages for emotional harm. But it has to be tethered. If there's a physical injury, then you can get those compensatory damages for emotional harm. So that's one response. The other is that punitive damages are available. So the physical injury requirement has no, does not implicate punitive damages at all. But are punitive damages ever available for a procedural due process violation? I don't see why they wouldn't be. I'm not aware of any precedent that says they're not. I think, you know, the sort of standard rules for the availability of punitive damages would apply. The same, you know, the same burden would have to be met. But if it's, if the process is denied with, you know, with maybe getting some of the, you know, key language wrong, but if the process is denied with, you know, callous disregard for the individual's rights, you know, the language that I believe Smith B. Wade is the case that is often cited for the punitive damages standard. So if that standard could be met, which I think it certainly could be here, then punitive damages would be available as well. So, so I know you're over time, but I would like to hear a little of your thoughts on the ADA, if that's okay with you. If that's okay with you. Certainly. So, you know, I think there's some confusion about what the nature of the ADA claim is here. So I thank you for the opportunity to clarify this. So Mr. Williams' ADA claim is under the subjected to discrimination prong of Title II. Okay. So Title II has essentially three prongs. The ADA is violated when an individual is excluded from program services or activities of a public entity, denied the benefits of program services or activities of a public entity, or subjected to discrimination by that public entity. And it's that last prong that we're focusing on here. And as this Court made very clear in Haberly 1, that does not require exclusion from or denial of the benefits of program services or activities. And as this Court also made clear in Haberly 1, failure to provide reasonable accommodations is a form of prohibited disability discrimination. I'm happy with that, because usually the quote reasonableness of the accommodation arises from a request for an accommodation. It makes no sense in this context, because you have someone who's alleging mental illness, and the degree of that I know there's some dispute about. But if someone is suffering from a mental disorder, especially if they're in solitary confinement for 26 years, I mean, if they weren't mentally ill when they went in, they won't be when they come out. But how can we expect them? How would the law treat a failure to have an accommodation? How would the person even know what a reasonable accommodation is? So a few responses to that, Judge McKee. First of all, in the Title II context, there is no need for the individual to necessarily request an accommodation. That comes from this Court's decision in Chisholm, which is cited in the brief, which talks about the Title II regulations are requiring public entities to take proactive measures to avoid disability discrimination. And if I may cite to mention a district court case that was not cited in our brief, but the case is Pierce v. District of Columbia. It was written by now-Justice Jackson when she was sitting on the District of Columbia. She really, it's really worth taking a look at because she forcefully rejects the notion that a Title II plaintiff must request an accommodation. And then she goes on to say. Where's the citation? I'm sorry. I'm sorry. I meant to give you that. Thank you for citing it. 128 F. Sup. 3rd, 250. And that's District of District of Columbia. And she goes on to say that the public entity has affirmative duty to determine when accommodations are required. And this is a quote. It's seemingly at its apex in the context of a prison facility in light of the uneven power dynamic between prison officials and inmates that inherently and appropriately exist. So I think that dispenses of the, you know, well, did he request an accommodation question. The other thing, I mean, I took your question also, Judge McKeith, to be getting at the reasonableness of potential accommodations. And that is a jury question. You know, whether a given accommodation is reasonable is a jury question. This Court said that in the Title I context in Buskirk v. Apollo Metals, 307 F. 3rd, 160. The Second Circuit has said that in the Title II context. Brooklyn Center for Independence of the Disabled v. Metropolitan Transportation Authority, 11 F. 4th, 55. And also the effectiveness of an accommodation. In other words, whether an accommodation, you know, is adequate, that's also a question for the fact finder. And this Court said that in Chisholm. So what about the requirement that the element that the claim, the by reason of disability element, I understand that that governs all Title II claims. And so I guess the argument goes that was Williams put in solitary confinement by reason of disability, or was it for a completely separate reason? Now, every now and then we know that, for instance, if a person is put in the RHU and they're disabled and the only showers that they have are inaccessible to a disabled person, then we found, hey, look, we've got a problem. Your inability to use the shower was by reason of your placement in the RHU and you're coupled with your disability. But here it feels like we don't necessarily have that same sort of issue because the decision to place in solitary confinement wasn't due to any preexisting mental health condition. It was due to the conviction for murder one. So, Your Honor, the by reason of disability element comes in through what this Court said in Haberly 1, which is that failure to provide a reasonable accommodation is a form of disability discrimination itself. We all, I think everybody here agrees that Mr. Williams was in solitary confinement because of his death sentence, not because of his disability. But nonetheless, we satisfy that element. And I think if I may offer a hypo that I think might clarify this for the Court. So imagine an individual who has a physical disability and uses a wheelchair. Imagine that he's on death row and imagine that the cells on death row, none of the cells on death row have accessible toilets. Okay? But the cells on general population, some of them do. Keeping that individual on death row without providing an accommodation would violate Title II, even though he's on death row because of his death sentence, not because of his disability, and he's in the same conditions as everyone else on death row. But those conditions affect him differently because of his disability, and Title II requires the prison to give him an accommodation to essentially level the playing field. You know, in this context, you know, we often think of discrimination or nondiscrimination as treating everybody the same. But in the disability discrimination context, what Title II often requires is that an individual with disability be treated differently to sort of level the playing field. And that's the situation here. And the hypo is a more sort of familiar form of physical disability, but the same logic applies with a psychiatric disability like Mr. Williams had. The prison had an obligation to take affirmative measures to modify the conditions of his confinement to eliminate the additional risk that solitary confinement presented to him in light of his disability. What if the answer was that it wasn't reasonable ever to keep a person with a mental disability in solitary confinement? If there was no accommodation that's available, so to speak, by following the policy, then what happens? You say then we just have to move into general population, or what? That is certainly possible. If the only thing that would adequately accommodate an individual like Mr. Williams would be to remove them completely from solitary confinement, then that's what would have had to have been done. And, again, whether both the reasonableness of that as an accommodation and the adequacy of it are both jury questions. And then where are we on kind of the 11th Amendment sovereign immunity, state sovereign immunity, Title II, Lane v. Tennessee, or Tennessee v. Lane, I forget, I think it was Lane v. Tennessee. Where are we on that? Is your position that because this has constitutional overtones, we're trying to look case by case, that this ADA claim does constitute an abrogation of state sovereign immunity such that you can get damages? Or is there some other angle that I don't see? Well, I think your Honor's correct. Yes, we are in the territory of there is also, you know, this conduct also violates the 14th Amendment. It also violates the Constitution. So, yes, there's a valid abrogation of 11th Amendment immunity. But I would also note that defendants have not asserted sovereign immunity at any point in this litigation, not in the district court, not here. And while this Court can reach it sua sponte, this Court's precedents say that it need not be reached sua sponte. So I would urge the Court not even to reach that issue. But, again, I think we clearly have conduct that also violates the Constitution here. And that's not something that the defendants even disputed below. I mean, they only argued clearly established below. They did not argue below that former Secretary Wetzel's conduct didn't violate the 8th Amendment. So I don't think we have a sovereign immunity problem. So due to that kind of case-by-case overlap with ADA and, in this case, doing a case-by-case analysis, what you would say is the overlap between the ADA and the 8th Amendment put us in abrogation space for this claim entirely. I think that's right, Your Honor. And I believe, you know, again, this was not briefed in this case. But I believe there's also a, under United States v. Georgia, I believe there is also another way to abrogate sovereign immunity. You know, even if the conduct doesn't also violate the Constitution. But I don't think we need to get to that here. And then does the PLRA's limitation on damages apply to the ADA as well? The physical injury requirement? Yes. I believe it does, Your Honor. That was not addressed, briefed here. But I believe it does. And then I guess the question is, are punitive damages – what does that leave of the ADA claim if there's no – and I remember what you said before, that there might be the ability to show some degree of physical suffering. But what does that leave of the ADA claim in terms of relief if you don't have – if there is no physical suffering, what sort of damages could you get there? Well, there would be compensatory damages. I will certainly grant that punitive damages are not available under Title II. I'm not arguing that. But there would be, you know, all the other forms of compensatory damages that are generally available. And if those are not out-of-pocket or physical suffering, that would seem to leave us in the emotional and mental suffering space, which might be prohibited? I think that's right, that that would be one of the forms of damages here, emotional and mental suffering. And when you say might be prohibited, do you mean because of the PRA? The PRA's operation in conjunction. Potentially. But, again, that has not been raised by defendants at all here, and that's something that would have to be dealt with on remand. You know, I don't think that's an issue that's currently before this Court. All right. Thank you. Sorry to keep you on longer. Any further questions? No. Thank you. We'll hear from counsel for FLE. Good afternoon. My name is Anthony Kowalczyk. I'm a Deputy Attorney General for the Commonwealth of Pennsylvania. I represent former Secretary of Corrections John Wetzel with respect to the 1983 claim under the Eighth Amendment and current Secretary Laurel Harry in her official capacity with respect to the ADA claim under Title II. And, of course, I'll address the hypothetical procedural due process claim as well, that counsel alluded to. Just to go to the very heart of the qualified immunity analysis, I'll try to make this as simple as possible. The Supreme Court in Ashcroft v. Al-Kid said that, you know, in order for a plaintiff to overcome qualified immunity in a context like this, the existing precedent must place the statutory or constitutional question beyond debate. There doesn't have to be a case directly on point, but it has to be beyond debate. It can't be a closed question. And debate for me, the principle that solitary confinement for a protracted period is bad, it takes seven months. That's bad. That's detrimental. But if the person is mentally ill, that's not necessarily detrimental. Help me understand that, because I think that's where you're going. There's not enough definition in the law to put Wetzel on notice. Correct. Yeah, that's correct. And Clarke v. Koop involves someone who, if I recall correctly, you know, had bipolar disorder, schizophrenia for 10 years, was being consistently treated, and was known to have been treated in that way. The plaintiff in Pellock v. Wetzel, the 2017 case, was an individual who was on the D roster. Okay. What we have in this case is an individual. To never get into the issue of fact. Okay. How disturbed was he mentally? That's where you're going with it. Mr. Williams? We want a summary judgment. Our Mr. Williams, yes. Well, there was no evidence that he was disturbed mentally from any preexisting mental illness. I mean, what we have – When he was 14, then he went back in after that for a period of time. There are all kinds of statements about suicidal tendencies, and I know you debate that because you're saying that he conceded that – he said at one point that he was faking it because he wanted to get out of the situation he was in where he was housed. I don't understand this. He was housed with no clothing or was it paper clothing? No, no. Well, there was a paper gown because what happened is on July 3rd, 1996, I believe, okay, he put a noose around his neck simulating a suicide. He now claims it was a real attempt. At the time, he claimed it was fake. What they did was they took him out of the cell, and they removed his clothes because they didn't want him to use them to hang himself, and he was draped in a paper gown, as I understand it, so he couldn't harm himself. He was in the – in an indestructible cell for two or three days, and then he said it was a fake, I didn't really try to do it. I wanted to go make a phone call, so that's why I faked it. Okay. Then they put him back in the cell in disciplinary custody for six months. Okay. From that point forward, he was offered a prescription for Prozac, which he refused. He said he didn't need it. He said he was fine. Well, that's not that progressive. That could well be consistent with mental illness, refusing medication. You see that all the time. But for that point forward, okay, from 1996 to 2019, he consistently said he didn't need any mental health treatment. John Wetzel didn't become Secretary of Corrections until 2011. So – Okay, so there's – I'm sorry, Judge Scripski. So I guess my thought is this. I might be reading into Judge McKee's line of questioning a little much. I don't know. He's not shy. He'll jump in and tell me I'm saying the wrong thing. But I guess one of the things I'm inferring is, is there a dispute of fact at this stage as to Mr. Williams' mental health? There's reasons to suggest that he did have mental health problems. He was institutionalized beforehand. There's reasons, as you point out, that he may not have been, strangely, at one level while in solitary confinement for a long time. But I guess the question is, if that's a genuine dispute, I can see this cutting two ways. And maybe you see other ways. But one of them is there's a genuine dispute. We have to let the case go forward to find out exactly where we are in the Eighth Amendment space. The other one is, if there's a genuine dispute and we don't know and Secretary Wetzel couldn't have known for certain about what his mental health condition was, then that moves us more into where is the clearly established law for inmates who present maybe inconclusive or less than definitive signs of mental health. That's where I see the fork in the road. We either say we need more info and the case should go forward, or we say this is proof positive that qualified immunity should play. Maybe there's a third or a fourth option. Maybe you disagree with both or one of those options. But at least to reveal a little of my thinking, that's what I take from this uncertainty. I don't think there's anything. Okay. There's really no way that you could possibly conclude that it would have been clear to Secretary Wetzel that keeping Mr. Williams in solitary confinement was unconstitutional. First of all, in Porter, this Court said that the objective prong, that they clearly established that it was not clearly established that solitary confinement in and of itself satisfied the objective prong, and that was as of September 1, 2020. The period of time at issue in this case ended on, and this is according to Mr. Williams' own testimony, December 3, 2019. Okay. And the other thing you have to look at is from 1996 forward, there was literally no evidence, zero evidence of mental incapacitation, mental disability. The only evidence that they have are two reports that were prepared in 1996, Dr. Fox and Dr. Crown, that were specifically prepared for his PCRA proceeding. And they were discredited in the PCRA proceeding. The Supreme Court of Pennsylvania affirmed the decision denying PCRA relief in 2004. John Wetzel didn't become Secretary of Corrections until 2011. There's no way that he could have possibly looked at any, I mean, viewing everything in the light most favorable to Mr. Williams, it couldn't have been clear to Secretary Wetzel that keeping him in solitary confinement violated the Eighth Amendment. There's no conceivable way. He didn't know he was disabled, and there's no way he could have known. But don't say there's no way he could have known, because I'd assume Mr. Wetzel was, I think, in any personal opinion, an extraordinarily good commissioner, a very conscientious commissioner, and I couldn't imagine that he would just turn a blind eye to the health of the people under his supervision, especially the folks who have been in solitary confinement for however many years it may have been back when he became commissioner. He could have known. Maybe you're saying that the law shouldn't impress that knowledge on you, but he clearly could have known. That was available to him. Well, he was very concerned, Judge McKee, and the record establishes that Mr. Williams had access to mental health professionals, and he could have spoken with them at any time he wanted, and he consistently said he didn't need to. And there was one instance where he talked to one of them because he had heat exhaustion working out in the yard in 2008 or 2009, but other than that, he just says, I don't need any treatment. I don't need any medication. And, you know, he denied. And when the record was supplemented in this case, we didn't object, by the way, to allowing these records to come in, you know, after the summary judgment deadlines. They showed that there was no evidence of mental disability in the record. And the 19th – But wouldn't his pre-incarceration records – maybe you're arguing he doesn't have an obligation to go back that far. But clearly he had – I can't imagine that his prison records, I've never seen one, don't know what's in there. But it's hard for me to imagine that it wouldn't have included the fact that this guy was committed when he was a 14-year-old. He was 14. Okay. And after that was committed again, I think voluntarily, because he said he needed help. And you're denying in large part the fact that he didn't ask for help, which is not unknown for folks who have a mental disorder to not admit they have a mental disorder and not ask for help. Well, he testified that he was classified – he was on the B – I'm sorry, on the C roster at one time and downgraded to B. Okay. But regardless – we don't know exactly when that change occurred. He testified that that occurred. But if you're C, you're not seriously mentally ill. If you're – but you're still receiving some kind of mental health, you know, treatment, but you're not considered seriously mentally ill. Okay. If you're B, you're not receiving any treatment and you're not considered seriously mentally ill. It's just that you had some prior history of it, but no current manifestation. So if you credit his own testimony as to how he was classified, it's clear that the DFC regarded him as someone who was not seriously mentally ill. I want to go back to the PCRA proceedings. Is there anything in the record to let us know that Secretary Wetzel was aware of that? Was aware of the PCRA proceedings? Of the – of what you were telling us about the determinations regarding the credibility of the doctors. Oh, I don't know that there's anything in the record that shows that Secretary Wetzel was personally aware of it. My point is simply that if Secretary Wetzel had heard of these reports, there's no evidence that he even knew what Dr. Crown and Dr. Fox said. But even if he did, that wouldn't trigger an immediate duty to say, okay, get him out of solitary. Say, okay, well, what about these records? And then that inquiry would inevitably lead to, okay, those were the PCRA. What happened in the PCRA? Well, they were discredited. So I don't know what he knew or what he didn't. That's not in the record. My point is we know what that conclusion would have led to, so there's no way he could have seen these and said, okay, we have to get him out of there. They had been discredited seven years earlier. So it strikes me at one level, and I suspect you're going to tell me that I'm wrong with this, but it strikes me at one level the more that you lean into the qualified immunity analysis of what Secretary Wetzel didn't know and he wasn't up to date or he just didn't see it. It almost begins to play on the other side into the procedural due process point, which says, hey, you know, maybe when you have somebody in solitary confinement, there would be use in routine check-ins and sort of assessments and things like this, so that we don't have a secretary who says for so, so, so long, I just looked and saw that you weren't on the seriously mentally ill list, and therefore it was fine. That may be good enough for qualified immunity for Eighth Amendment purposes, but doesn't that kind of cut into, you know, the equities at least of wanting a procedural due process check-in? Well, Your Honor, I think in this case it's clear that remand to allow him to amend, to add a procedural due process claim would be futile, because this Court has already said, has specifically in the Craig Williams case in 2017, okay, that liberty interest was limited to those whose death sentences had been vacated or reversed in PCRA proceeding. And then in the Porter case, that was a situation where it was set aside on habeas, and even though it was stayed pending appeal under the local rule here, there was still a liberty interest because the death sentence had been set aside. This case, the death sentence has never been set aside. All we had, you know, a death warrant was signed, I believe it was December 20th, 2004, by Governor Rendell. The district court here in the Eastern District stayed the execution in January of 2005, but the execution was stayed. The death sentence is still intact. The habeas proceeding is still pending. Eighteen years later, that sentence has never been set aside. So this Court has never recognized a liberty interest, you know, in that context. So what you're saying is unless there's some question to the integrity or the continued vitality of the death sentence, then there's no liberty interest in play for procedural due process purposes. That's correct. Now, if you were to explain, that's definitely the law. The Prieto decision, by the way, from the Fourth Circuit from 2015 that I cite, I cited that case for a very specific reason, and that is that this Court cited it in the Craig Williams case, specifically distinguishing someone with an active death sentence from someone whose death sentence had been set aside. I understand Mr. Till correct me if I'm wrong in the above, but I understand him as not arguing a 14th Amendment liberty interest, but a procedural interest. Well, a liberty interest that would entitle him to procedural due process is the way I understand it. Because procedural due process is a deprivation-based theory. You have to be deprived of life, liberty, or property before you get process. What you're saying is he's not claiming life or property. He's claiming liberty, and you don't see liberty when there's no question to the continued strength of his death. Well, we're going to let you go over a little. Okay. I didn't get your eye on it, but we're going to let you go over a little because we let your friend on the other side go over it, and there's a couple of deep issues still we need to get to. I have some questions about the ADA claim, and I want to focus on the last two elements, starting with subjected to discrimination by any such entity. In Haberly 1, we explain that discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for plaintiff's disabilities. And then in Fergus, we said, we held that a prisoner has a prison has an affirmative duty to accommodate disabilities. Why wouldn't that extend to the types of disabilities that we're talking about with Mr. Williams? Assume for me that there's a material dispute of fact regarding whether or not he has a disability. Okay. I'll assume that, yeah, and as I believe, yeah, as the district court did as well. Okay. I'll take the two cases you gave me. I'll start with Fergus. Okay. Fergus involved the RHU inmate who was physically handicapped and could not get a shower because, you know, he was in the RHU the same as everybody else. Okay. But unlike the other inmates, he couldn't get a shower because the shower was not handicapped accessible. So the Title II required that affirmative action be taken in that case, in that instance, assuming, you know, as the facts were alleged in that case, I mean, so that he could get a shower just like the other non-disabled inmates. Okay. In the Haberly case, if I recall correctly, that's the suicide during the police encounter case where somebody committed suicide because the police weren't, from that borough, were not properly trained to deal with someone who, and the individual committed suicide when a non-disabled person in the same context would not have committed suicide. What we have here is a situation where there was, there's nothing that Mr. Williams was denied because of a disability. Nothing at all. I mean, he was literally, everything that he was denied, he was denied because of a death sentence. And he can't distinguish himself from the non-disabled inmate, from the non-disabled death row inmate, the way that the RHU resident in Fergus could or the way that the suicide victim in Haberly could. Well, that answer seems to me to focus on the by reason of his disability prong. Yes. And I know that you contend that he was discriminated against because of his death sentence. That is, he was there because of his death sentence. That's why he was placed in solitary confinement. But in Fergus, I thought the argument there was the reason that person was in solitary confinement was because of their behavior, and not because of their disability. And the court said the reason why a prisoner was housed in solitary confinement is irrelevant. A prisoner's misconduct does not strip him of the right to reasonable accommodations, and a prisoner's obligations to comply with the ADA does not disappear when inmates are placed in a segregated housing unit, regardless of the reason for which they are housed there. So why doesn't that cut, why doesn't that undercut your argument that we don't have by reason of disability because he was on death row? Well, he can't establish that he was denied anything because of the disability. The fact that he was on, okay, if he were on death row, okay, and he were disabled the way that the inmate in Fergus was, for instance, and couldn't get a shower, okay, he would, the prison would still be obligated to comply with Title II to make sure he could get a shower, just like the non-disabled inmates. So it sounds to me like the distinction you're making is between physical disability and mental disability. Not, Your Honor, no. That's not what I'm trying to say. Okay, if you had, if Mr. Williams were denied something, anything, in the prison because of the mental disability, if he were being disadvantaged in some way that was not, you know, that couldn't be, that wasn't shared by the non-disabled inmate, then the prison would have an obligation to do something about it. So you're focusing on denial. I think your opponent would say, no, it's not a denial, it's the addition of a hardship due to the disability, and that probably also qualifies as discrimination in that putting a person with mental illness in solitary confinement is harder than putting a completely mentally healthy person in solitary confinement. So I think you're focusing on denial, and maybe we have a denial of benefit sort of situation here. But the flip side is what's the role of increased hardship in the ADA analysis? Well, increased hardship, you know, if you assume that increased hardship, okay, if we assume that that's discrimination, okay, we also have to, you have to look at the context we're dealing with here, and that is he can, he's suing for compensatory damages, and in order, he can't seek prospective relief. He testified that these conditions are gone. Okay, so we're not dealing with any kind of injunctive or declaratory relief. We're dealing with monetary relief, and the remedies available are those available under Title VI and under Section 504 of the Rehabilitation Act. In order to show, in order to recover compensatory damages, he has to show intentional discrimination. Okay? And they can't discriminate against him without knowing that he's disabled. So he denied for years, I mean, what is it, 23 years, he denied that he was ill, he refused medication, and there was never any indication during that entire time that he had any need that he was being disadvantaged because of a mental illness. So there's no way that anyone in the DOC could have possibly discriminated against him intentionally under these circumstances. I mean, in the case of the Fergus case, okay, any person could walk in the prison cell and see someone who, well, actually, I don't know if he was in a wheelchair or what the situation was, but it's easy to necessarily tell, okay, somebody can't use the wheelchair, you might be able to infer that there was intentional discrimination, but you can't tell whether someone's disabled by looking at them, like this court said in Garachi, for instance. In order to discriminate against somebody based on a trait, like disability or pregnancy, you have to actually know that they're pregnant or disabled. And in Garachi, that was 1996. So in order to show intentional discrimination, like they have to show, they have to show that the DOC intentionally discriminated. It's the fact that he was secretly suffering wouldn't change anything. So the subtext of your argument, if I understand it, is that disabilities that are more prominent and harder to disguise or harder to present are easier to show intention. Disabilities that are more disguisable or present less risk are easier to show intention. And so you can readily make it much harder for a person with such a disability to bring, to recover under the ADA or the Rehab Act. Oh, I think that's true. I mean, yeah, think about it like, for instance, Title VII. I think Garachi was a case I was referring to where this court said, you know, sometimes you can tell someone belongs to a protected class by looking at them. You can ordinarily tell whether someone's male or female, black or white. You can't necessarily tell whether someone's disabled. And in that case, you can't necessarily tell whether someone's pregnant. Sometimes you can, sometimes you can't. So in order to infer that there was a discriminatory intent, intentional discrimination, there has to be some evidence that there was some manifestation of the trait that would trigger the intentional discrimination. You can't just infer, discrimination can't be inferred. Intentional discrimination can't be inferred because someone may have been secretly suffering under circumstances in which that were not apparent to anyone. So I definitely think that that's true. And I think this Court has recognized that, and that's why they cannot win this case. Thank you very much. Thank you, Your Honor. Mr. Feldman, are you at three minutes for rebuttal? Is that what you reserved? Yeah, that is what I reserved, Your Honor. We'll see if we keep you too long. We've gone over a little bit, but we'll try not to keep it excessive. Maybe you can begin by addressing your friend's last point about the manifestation of the trait. That there has to be some manifestation of the trait in order to say that someone is discriminating against someone else because of the trait. Certainly, Your Honor. Also, even the District Court acknowledged that there was a factual dispute as to the DOC's awareness of Mr. Feldman's mental illness. So that really settles that question. That's for the jury at that point. And I'll note that, you know, while the ADA claim and the Eighth Amendment claim both involve deliberate indifference, those standards are different in a couple ways. And it's a lower bar for us to reach on the ADA claim than it is on the Eighth Amendment claim, in part because for the ADA claim, that's a claim against the entity. We have to show the entity's deliberate indifference. So not any one specific DOC employee. And there's ample evidence in the record of the DOC's awareness of Mr. Williams' mental illness, including his statement that the Fox and Crown declarations were provided to the DOC, including the very fact, as came up during my friend's argument, that they offered him Prozac. I mean, if they didn't believe he was mentally ill, they would not have offered him Prozac. And there's his statement that he told the DOC psychologist about his history of mental illness. So there's plenty of evidence of that. To get to another issue that came up in the discussion of the ADA, Judge Pipps, you were asking about, you know, increased hardship. And we cite several cases in our brief that involve that sort of ADA violation. Some of them involve use of force situations where prisons don't, prisons or police don't sort of modify their use of force practices to deal with mental illness. Others involve, like this case, isolation, where sort of standard isolation procedures are not modified to account for the needs of people with psychiatric disabilities. So... How would you modify that? Well, in my brief, I list a few potential ways that these conditions could have been modified. Yeah, at one end of the continuum, you do have simply removing him from solitary confinement completely, but offering additional out-of-cell time, offering therapeutic groups, offering other programs. All of those things are possibilities. None of them were done. And again, like I said earlier, the reasonableness and the adequacy of any of those potential modifications are jury questions. Can I just get in? You know, don't worry too, too much about the time, right? But... You know, but this notion of increased hardship in the ADA, it doesn't strike me as textual, right? I think the ADA talks about denial of benefits and exclusion from participation. Those might be the kind of buzzwords. They don't say an increase the hardship for, right? So it does seem to be, you know, a statute that looks really kind of one-directional, not mutually exclusive. Making it worse, but just not, you know, not opposing something extra, just not taking something away. And your opposing counsel says, we took nothing away. Your example of the toilet I thought was really, really good, but that's not necessarily where your client is, because what was taken away from him is kind of what I'm getting at. I get maybe that it was increased hardship for him. I can see that. But I don't know that increased hardship is a synonym for deprivation or exclusion. Can you work with me on that? Can you kind of just tease out how that happens in your view? Certainly, Your Honor. Looking at the text of the statute, it's very clear that the subjected to discrimination prong is separate from those first two prongs, and has nothing to do with exclusion from or denial of the benefits of program services or activities. I think that flows directly from the text of the statute, but lest there be any doubt, Haberly 1, this Court made that very clear. Because the Court said, we're not going to reach the question of whether arrests are a program service or activity, because instead, we can just analyze this under the catchall subjected to discrimination prong. As I explained in the reply brief, that analysis is mirrored by the Supreme Court and Sheehan, where it really clearly distinguishes between these forms of ABA liability. JV, which is a Tenth Circuit case, Percol, which is an Eleventh Circuit case, all cited in our reply, make very clear that the subjected to discrimination prong is not tethered to denial of the benefits of program services or activities or exclusion from program services or activities. It's just three ways to do this. We're banking only on the third. And in your view, that third encompasses an increased hardship due to disability. Yes, Your Honor, that's exactly right. And I don't really see a meaningful distinction between, you know, increased hardship in the form of more psychological harm and greater risk of psychological deterioration on the one hand, versus increased hardship in the form of, you know, I think they're both forms of increased hardship. To safely use a toilet. I was referring back to the example that I gave earlier. So if I may move on from the ADA claim to a couple other points, or I know I'm way over time, so. You can wrap up. Why don't you wrap up? I think the panel still has patience. It's our fifth case of the day. This is an important one. So see what you can do. I'm not going to go into detail on the 14th Amendment claim. I did not get to give you a response. So I was hoping to do that now. I think the way I think of this is that in Williams, in the Craig Williams case, this Court, you know, granted qualified immunity, but that was a case that did not involve any preexisting mental illness. And I think this Court essentially said it was a close call. The Court said that Schultz should have counseled caution. Schultz involved an individual who was in administrative custody for seven years without any process, and that should have counseled caution. Well, if it should have counseled caution there, here, when you factor in the mental illness, I think that pushes it over the line, such that any official would have had fair warning that their conduct was violative of the Constitution. And as I said, I know him over time, so I will stop there unless there are additional questions. Thank you very much. Thank you.